383 S.E.2d 277

**K–MART CORPORATION**

v.

**WEST VIRGINIA HUMAN RIGHTS COMMISSION and Abdul Baram.**

**No. 18565.**

Supreme Court of Appeals of West Virginia.

April 6, 1989.

Dissenting Opinion May 4, 1989.

Rehearing Denied July 20, 1989.

Charles G. Brown, Atty. Gen. and Sharon M. Mullens, Asst. Atty. Gen., Charleston, for Abdul Baram and WV HRC.

Larry W. Blalock, Jackson & Kelly, Charleston, for K–Mart Corp.

BROTHERTON, Chief Justice:

This case involves an appeal by the appellants, Abdul Baram and the West Virginia Human Rights Commission, from the order of the Kanawha County Circuit Court entered on September 9, 1986. In that order, the court reversed the finding of the Human Rights Commission and concluded that the evidence in the record did not substantiate a conclusion that Mr. Baram and his family were discriminated against by K–Mart Corporation when they were observed as possible shoplifters.

On September 19, 1981, Mr. Baram, his wife (Ms. Dehnah), their two children, and several adult relatives entered the St. Albans K–Mart store with the intention of purchasing gifts for the relatives to take with them back to Syria. Only Ms. Dehnah wore the traditional loose-fitting Islamic dress. Upon seeing the Baram family group heading toward the store from the parking lot, the K–Mart personnel called the St. Albans Police as a precautionary measure, believing the Barams might be a group of shoplifters the store had been warned were victimizing the area. Upon entering the store, the Barams shopped for approximately fifteen minutes without incident, until Ms. Dehnah noted that the group was being observed by K–Mart employees and one policeman. Upon learning that he and his family were being watched, Mr. Baram remarked "Don't pay [them] any attention. Who cares?" Hearing Transcript at p. 26. While shopping, neither the police nor any K–Mart personnel confronted or hindered the Barams.

Eventually, Mr. Baram confronted a K–Mart manager and asked why his group was being watched. The manager explained that all customers were observed while in the store and apologized for any embarrassment or inconvenience. Shortly thereafter, the Barams left the store, leaving several half-filled shopping carts.

At this point, an officer with the St. Albans Police Department, who had been summoned to the store with two other officers, instructed one of the officers to follow the Barams down the mall to keep an eye on them. After traveling approximately 800 yards from the entrance of the K–Mart store, Mr. Baram realized he was being followed by the police. Mr. Baram angrily requested to know why he was being followed. The officer, believing that Mr. Baram was going to "jump me or something," advised Mr. Baram that he had been instructed by his supervisor to follow him and called for a back-up unit. This confrontation was observed by passing mall patrons. Thereafter, the Barams left the shopping center.

Later, Mr. Baram contacted the St. Albans Police Department to inquire about their actions. It was explained to him that K–Mart personnel had believed he and his family might be associated with "gypsies," who routinely engaged in shoplifting.

Subsequent testimony revealed that approximately a week or two before September 19, 1981, K–Mart had received a warning from county sheriffs that a group of "gypsies" was present in the area and had victimized a local Putnam County store through mass shoplifting. The term "gypsy" was used generically among retail merchants and police, referring to an organized band of shoplifters of no specific origin or nationality.[1] K–Mart noted that in 1980, the St. Albans K–Mart store had been victimized by a similar group of shoplifters who entered the store, dispersed, and through "diversionary tactics and skilled shoplifting techniques," proceeded to conceal and attempt to steal a large amount of merchandise. On that occasion, the St. Albans Police were summoned and, with the help of K–Mart personnel, restored order and arrested the shoplifters.

On November 17, 1981, the Barams filed a complaint against K–Mart with the Hu-

1. We note, however, that one officer later testified at the hearing that "gypsies" were usually of darker skins, wore loose fitting clothes, and wore rancid perfume.

man Rights Commission, claiming discrimination on the basis of national origin in a place of public accommodation (No. PANO 254–82).[2]

A Human Rights Commission hearing was held on April 8, 1985. The Barams claimed that they had been discriminated against because of their national origin. K–Mart responded that their actions were justified as they believed the Barams fit a bona fide shoplifting profile, pointing to their prior victimization by the organized band of shoplifters and the warning received in the weeks prior to September 19, 1981. Further, K–Mart asserted that there was no discrimination against the Barams because of their national origin, noting that the Barams openly admitted they shopped without any trouble at least once a week for over a year at the St. Albans K–Mart.[3]

Following the public hearing, findings of fact and conclusions of law were entered on May 23, 1985, which concluded that K–Mart had denied Mr. Baram and his family "the advantages, privileges and services offered to other K–Mart customers because of the ethnic appearance (and the national origin) of the complainant and his family because of the dress of Ms. Dehnah (Mrs. Baram)." In the conclusions of law, the Human Rights Commission Hearing Examiner stated that:

> Although recognizing responsibility to protect both the store's merchandise and store patrons, the complainant and his family were victims of the respondent's unreasonable surveillance, intimidation and public embarrassment and thus unable to purchase the gifts which they had intended. Furthermore complainant and his family were made to feel uncomfortable, unwelcome and afraid to remain in the store, although they were never told or asked to leave by the respondent.

Discrimination in access to public accommodation may arise through subtleties of conduct just as surely as through openly expressed refusal to serve. Such discrimination may occur where no physical violence is used or threatened and where the defendant merchant is courteous. *Browning v. Slenderella Systems of Seattle,* [54 Wash.2d 440] 341 P.2d 859 (Wash.1959).

Conclusion of Law No. 9. In Conclusion of Law No. 10, the hearing examiner stated that "shoppers who are detained by store employees or police who lack probable cause to believe they are shoplifters suffer deprivation of their civil rights.... Shoppers who are forced to leave a store because of discriminatory, unreasonable actions of store employees suffer no less deprivation. *Adickes v. Kress & Co.,* 398 U.S. 166 [144, 90 S.Ct. 1598, 26 L.Ed.2d 142] (1970)." The hearing examiner recommended incidental damages to be awarded to Mr. Baram in the amount of $1,250 to compensate him for embarrassment, humiliation, and emotional and mental distress.

These recommendations were forwarded to the Human Rights Commission. On July 18, 1985, the Commission entered a final order which adopted the hearing examiner's findings of fact and conclusions of law, but modified the proposed order by increasing the incidental damages from $1,250 to $10,000. No basis was given for the increase.

K–Mart appealed the decision to the Circuit Court of Kanawha County, seeking review of the Commission's decision both on liability and damages. The circuit court reversed the Commission's findings on both issues and stated, in pertinent part:

> There is no evidence in the record to show that the police were summoned be-

---

**2.** The Barams also filed a Human Rights complaint against the St. Albans Police Department (No. PANO 253–82). After conducting an investigation, the Human Rights Commission concluded on February 3, 1983, that there was no probable cause to believe the St. Albans Police Department had discriminated against Mr. Baram.

**3.** The Barams testified that after the incident on September 19, 1981, they continued to shop at K–Mart stores in the Kanawha Valley, although they did not return to the St. Albans store. Mr. Baram and his wife had no problem whatsoever shopping in these K–Mart stores. The Barams also testified that during the year preceding September 19, 1981, when they shopped weekly, without incident, at the St. Albans K–Mart store, they carried a K–Mart courtesy card.

cause of the national origin or ethnic appearance of the members of the Baram party.

\*     \*     \*     \*     \*     \*

The record clearly shows that the police were summoned because the Baram party fit a shoplifting profile.... It was the potential for shoplifting that caused the police to be summoned.

\*     \*     \*     \*     \*     \*

The evidence in the record does not substantiate the conclusion of the Human Rights Commission that the complainant was denied the privileges accorded to others because of national origin.

Furthermore, there is no evidence in the record to show that the complainant was denied any privileges accorded to others. At no time were any members of the Baram party denied service by K–Mart employees. No member of the Baram party was denied the opportunity to purchase any goods which K–Mart offered for sale. The Baram party was not denied entry to the store, and was not asked to leave the store.

The only problem that the complainant had with K–Mart is that they were observed by K–Mart personnel while in the store. The mere fact that the complainant's party was observed by K–Mart personnel does not constitute a violation of their human rights. This is a risk inherent in shopping in any store at any time. Had the complainant not initiated verbal contact, it does not appear any contact would have occurred.

This proceeding is the Barams' appeal from that final order.

The sole issue before this Court is whether K–Mart Corporation denied the Barams the advantages, services, and privileges offered others at its St. Albans, West Virginia, store, a place of public accommodation, because of their national origin. For the reasons stated below, we find no discrimination and affirm the opinion of the Kanawha County Circuit Court.

This Court has not yet had the opportunity to address in detail discrimination occurring in places of public accommodation, as the majority of the case law in our jurisdiction has dealt with discrimination in employment.[4] Our decision in *Shepherdstown V.F.D. v. West Virginia Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983), while touching briefly on discrimination in places of public accommodation, is primarily concerned with employment discrimination. Specifically, this Court held that:

[i]n an action to redress unlawful discriminatory practices in employment and access to "place[s] of public accommodations" under The West Virginia Human Rights Act, *as amended, W.Va.Code 5–11–1 et seq.*, the burden is upon the complainant to prove by a preponderance of the evidence a prima facie case of discrimination, which burden may be carried by showing (1) that the complainant belongs to a protected group under the statute; (2) that he or she applied and was qualified for the position or opening; (3) that he or she was rejected despite his or her qualifications; and (4) that after the rejection the respondent continued to accept the applications of similarly qualified persons. If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the pre-

---

**4.** We discussed the general standards for determining employment discrimination in *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986), in which the guidelines enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979) were examined. After noting that the Supreme Court never intended the *McDonnell Douglas* test "to be a panacea to correct all discrimination wrongs," this Court formulated a new test to deal with general cases of discrimination. 178 W.Va. at 170, 358 S.E.2d at 429. That general test, however, dealt only with employment discrimination and is inapplicable in this situation.

*See also Price v. Boone County Ambulance Authority*, 175 W.Va. 676, 337 S.E.2d 913 (1985); *State v. Logan–Mingo Area Mental Health Agency*, 174 W.Va. 711, 329 S.E.2d 77 (1985).

sumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

Syl. pt. 3, 172 W.Va. at 628–29, 309 S.E.2d at 343–44. We, therefore, turn to W.Va. Code § 5–11–1 *et seq.* (1987) for guidance in determining what constitutes discrimination in a place of public accommodation.

West Virginia Code § 5–11–9 (1987) sets out the elements necessary for a party to make a complaint of discrimination in a place of public accommodation. Specifically, W.Va.Code § 5–11–9(f)(1) (1987) provides that it shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation to:

> [r]efuse, withhold from and deny to any individual because of his race, religion, color, national origin, ancestry, sex, age, blindness or handicap, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of such place of public accommodations.... [5]

■ For the purpose of creating a workable test, we believe that the elements found in W.Va.Code § 5–11–9 (1987) and our opinion in *Shepherdstown* can be easily adapted to situations involving discrimination in places of public accommodation. Therefore, we propose the following test for determining whether a complainant has proved a prima facie case of discrimination in places of public accommodation in violation of W.Va.Code § 5–11–9 (1987). The complainant must prove the following elements:

1. that the complainant is a member of a protected class;

2. that the complainant attempted to avail himself of the "accommodations, advantages, facilities, privileges or services" of a place of public accommodation; and

3. that the "accommodations, advantages, facilities, privileges or services" were withheld, denied, or refused to the complainant.

■ Once the complainant has established a prima facie case of discrimination, the burden shifts to the defending place of public accommodation to demonstrate a legitimate and nondiscriminatory reason for their action sufficient to overcome the inference of discriminatory intent. 172 W.Va. at 637, 309 S.E.2d at 352.[6] If the defendant is successful in rebutting the prima facie case of discrimination, the complainant then has the opportunity to show that the reason given by the defendant was merely a pretext for a discriminatory motive. *Id.*

■ Turning to the case at hand, we find that the first two factors of the test are simple to apply—there is no question that the complainant and his family are members of a protected class and that the Barams entered the store intending to shop for and purchase merchandise. The final factor, however, is more problematic.

The appellant cites as proof of discrimination the fact that the police were summoned shortly after the family group headed toward the store. He further points to his wife's traditional loose fitting dress and the darker skin color of some members of the group as the basis for suspicion. Those facts alone, however, are insufficient to persuade us there was a nexus between the Barams' national origin and the police summons where no services were denied or

---

**5.** There is no question that the St. Albans K–Mart store was a place of public accommodation. West Virginia Code § 5–11–3(j) (1987) defines a "place of public accommodations" as "any establishment or person, as defined herein, including the state, or any political or civil subdivision thereof, which offers its services, goods, facilities, or accommodations to the general public, but shall not include any accommodations which are in their nature private...."

**6.** In *Conaway,* we noted the nondiscriminatory reason given by the employer did not even need to be a "particularly good one." 178 W.Va. at 171, 358 S.E.2d at 430. However, the reason cannot be a pretext in itself and must be suffi-

refused.[7] In fact, nowhere in the record do we find that the appellant and his family were actually denied, refused, or withheld any services or amenities as required by W.Va.Code § 5–11–9 (1987) and the last element of our test. The complainant, who entered the store and shopped without hindrance, left without attempting to buy any items offered by K–Mart. No one approached the Barams while shopping nor asked them to leave. Consequently, we do not believe that a violation of W.Va.Code § 5–11–9 (1987) occurred on September 19, 1981.

Even assuming, however, that the complainant had made a prima facie case of discrimination, we believe that the appellee demonstrated a legitimate, nondiscriminatory reason for its actions. K–Mart points to its previous experience with shoplifting bands, the warning call it received in the week prior to the incident, and its obligation to protect both its customers from danger and its inventory from shrinkage. Most influential in our decision, however, is the fact that the Barams admitted to peaceably shopping at the St. Albans K–Mart at least once a week for a full year prior to September 19, 1981, despite the fact Ms. Dehnah wore her native dress and Mr. Baram had dark skin. Moreover, the Barams acknowledged that they had obtained a K–Mart "courtesy card" for use when purchasing goods. If discrimination had been a motive, surely K–Mart would have denied them the card in order to discourage their shopping. Given those facts, we believe the shoplifting warnings and the chance fact the family group fit the profile of the shoplifting band precipitated the police summons, not discrimination.

Nor was the complainant able to show that the reasons given by K–Mart were a pretext for a discriminatory motive. Nowhere in the record is it suggested that the warning of shoplifters in the area was untrue or a pretext. Moreover, as discussed above, the Barams' allegations that their garb and skin tone precipitated the police summons were weakened by their admission that they shopped at that K–Mart without incident for an extended period prior to September 19, 1981.

The appellant points to *Browning v. Slenderella Systems of Seattle*, 54 Wash.2d 440, 341 P.2d 859 (1959) in support of their contention that because the Barams were made to feel uncomfortable and unwelcome, discrimination occurred. We are not persuaded by this reasoning. In *Browning*, the "discourteous" defendant, Slenderella, refused to serve the complainant at its treatment salon because of her race. Unlike *Browning*, however, nothing was ever refused or denied the Barams and therefore, *Browning* is not applicable to this situation.[8]

Standing alone, we do not believe rudeness is sufficient to prove a prima facie case of discrimination. While we do not

cient to overcome the inference of discriminatory intent created by the prima facie case.

**7.** The complainant also implies that the term "gypsies" itself was a racial term. However, at the hearing, K–Mart noted that the term "gypsies" was not meant racially, but rather as a generic term used to describe roving bands of shoplifters. It was Sergeant Halstead of the St. Albans Police Department who defined gypsies as usually being dark skinned and wearing long clothing. *See* Finding of Fact 19. We note that the complaint against the police department was not found to be based upon probable cause and no appeal was taken.

**8.** Similarly, we find the appellant's reliance on *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), to be unsubstantiated. In Conclusion of Law No. 10, the Human Rights Commission cited *Adickes*, con-

cluding that "[s]hoppers who are forced to leave a store because of discriminatory, unreasonable actions of store employees suffer no less deprivation." A careful review of the Supreme Court's opinion in *Adickes* reveals that service was denied to the complainant because she was in the company of black persons. Therefore, like *Browning, Adickes* is inapplicable to the case at hand.

Conclusion of Law No. 10 contains another element we find disturbing. The Human Rights Commission concluded that "[s]hoppers who are detained by store employees or police who lack probable cause to believe they were shoplifters suffer deprivation of their civil rights." The Human Rights Commission found no probable cause to proceed in the Baram's complaint against the St. Albans police. As the only detention that day was made by the St. Albans police outside the K–Mart store, we believe this conclusion is factually incorrect.

mean to dismiss the effect of intimidation as an element in discrimination, it is, at best, too objective and difficult to quantify alone. Rather, intimidation should simply be treated as a factor in our test to determine whether the complainant has made a prima facie case of discrimination. In the present case, even considering this additional factor, we still must conclude that the appellant failed to prove a prima facie case of discrimination in a place of public accommodation.

We feel compelled to point out that while we do not condone merchants calling the police at the sight of a person or party it believes to be a possible thief, our holding today is based solely on the fact that we find no nexus between K–Mart's actions, while hasty and perhaps imprudent, and the Baram's national origin. No violation of W.Va.Code § 5–11–9 (1987) has occurred, and we, therefore, affirm the decision of the Kanawha County Circuit Court.

Affirmed.

MILLER, Justice, dissenting:

One can only read with dismay the majority's analysis of a rather straightforward act of discrimination. Presumably, if K–Mart had unleashed fire hoses or police dogs on the Barams or if its personnel had stood in the doorway blocking access to the store, the majority would find that an act of discrimination had occurred. Anything less subtle seems beyond the majority's understanding.

While the majority states that "[t]he sole issue before this Court is whether K–Mart Corporation denied the Barams the advantages, services, and privileges, offered others at its St. Albans, West Virginia store," 181 W.Va. at 476, 383 S.E.2d at 280, it spends little time on this issue. Instead, it delves into a variety of possibilities intend-

ed to denigrate the Barams and to justify the conduct of K–Mart and the police it summoned to the store. This is done in spite of the fact that there is absolutely no dispute in the record that Mr. Baram has been a resident since 1973, has an electrical engineering degree, and is a successful businessman.

Initially, we are advised by the majority that "K–Mart personnel called the St. Albans Police as a precautionary measure, believing the Barams might be a group of shoplifters the store had been warned were victimizing the area." 181 W.Va. at 474, 383 S.E.2d at 278. This call was made even before the Barams had come into the store. The majority then informs us that after the Barams left the store and were being followed by the police some 800 yards from K–Mart, Mr. Baram asked the police officer why he was being followed. The majority then reports: "The officer, believing that Mr. Baram was going to 'jump me or something,' advised Mr. Baram that he had been instructed by his supervisor to follow him and called for a back-up unit." 181 W.Va. at 474, 383 S.E.2d at 278. Obviously, the majority insinuates that Mr. Baram is a dangerous fellow, given to physical violence toward police officers, and as a result the officer "called for a back-up unit."

Next, we are provided what lies close to the heart of the majority's opinion, and its stated reason that the Barams deserved what they got. In a call Mr. Baram made to the St. Albans police after the incident, "[i]t was explained to him that K–Mart personnel had believed he and his family might be associated with 'gypsies,' who routinely engaged in shoplifting." 181 W.Va. at 474, 383 S.E.2d at 278. The gypsy theme is then fully elaborated upon in the majority's next paragraph.[1] We are

---

1. The full text of this paragraph is:

"Subsequent testimony revealed that approximately a week or two before September 19, 1981, K–Mart had received a warning from county sheriffs that a group of 'gypsies' was present in the area and had victimized a local Putnam County store through mass shoplifting. The term 'gypsy' was used generically among retail merchants and police, re-

ferring to an organized band of shoplifters of no specific origin or nationality. K–Mart noted that in 1980, the St. Albans K–Mart store had been victimized by a similar group of shoplifters who entered the store, dispersed, and through 'diversionary tactics and skilled shoplifting techniques,' proceeded to conceal and attempt to steal a large amount of merchandise. On that occasion, the St. Albans

informed in note 1 "that one officer later testified at the hearing that 'gypsies' were usually of darker skins [sic], wore loose fitting clothes, and wore rancid perfume."

It must be remembered that Mr. Baram was accompanied by his wife and two other adult couples and that everyone except Mrs. Baram wore western-style clothing. Consequently, it is beyond belief how the majority can place any credence on K–Mart's assertion that the Barams fit a "bona fide shoplifting profile."[2] This assertion has no more validity than that of the store manager in *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There, the manager stated that he refused to serve a mixed group of blacks and whites "because he was fearful of a riot in the store by customers angered at seeing a 'mixed group' of whites and blacks eating together." 398 U.S. at 154, 90 S.Ct. at 1606, 26 L.Ed.2d at 152. (Footnotes omitted). This was soundly rejected by the Supreme Court.

Laying aside these peripheral matters, which serve only to draw the unwary reader's attention from the crucial issue, it is apparent that Mr. Baram is entitled to the benefit of Syllabus Point 1 of *West Virginia Human Rights Comm'n v. United Transp. Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981): "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." I conclude that the Commission's finding of discrimination is amply supported.

Even the majority admits that Mr. Baram's "group was being observed by K–Mart employees and one policeman." 181 W.Va. at 474, 383 S.E.2d at 278. The Commission found that they were being followed by K–Mart personnel as they attempted to shop in the store. Mr. Baram tried to ask the K–Mart personnel why they were being followed. He received no

satisfactory answers. It was obvious to him that other patrons observed the surveillance of his group, and he became embarrassed and humiliated, as did his wife and the other members of the group.

This harassment caused the Barams to abandon any attempt to shop and to leave the store. The three policemen who had come to the store at K–Mart's request continued to follow them as they entered the St. Albans Mall. Other patrons at the mall witnessed this event. This only further humiliated Mr. Baram and his family, as it appeared that they were being chased by the police. They then gave up any further thought of shopping at all, proceeded to their vehicle, and left the mall.

If this is not discrimination, then I have misunderstood the law. Discrimination need not be overt. Indeed, as New York's highest court stated more than thirty years ago in *Holland v. Edwards*, 307 N.Y. 38, 45, 119 N.E.2d 581, 584, 44 A.L.R.2d 1130, 1135 (1954):

"One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive—for we deal with an area in which 'subtleties of conduct ... play no small part.' Cf. *National Labor Relations Bd. v. Express Pub. Co.*, 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930."

The majority dismisses *Browning v. Slenderella Sys. of Seattle*, 54 Wash.2d 440, 341 P.2d 859 (1959), by stating that "the 'discourteous' defendant, Slenderella, refused to serve the complainant." 181 W.Va. at 478, 383 S.E.2d at 282. To the contrary, the manager was courteous and never refused to serve the complainant, but just never got around to actually serving her:

"The plaintiff was not told in so many words that she would not be served, or that she should leave; nor was any phys-

---

Police were summoned and, with the help of K–Mart personnel, restored order and arrested the shoplifters." 181 W.Va. at 474, 383 S.E.2d at 278.

**2.** This language appears to be an invention of the majority. It was not used by the police or by the K–Mart personnel.

ical violence used or threatened. The defendant's employees were always courteous; however, one need not be obvious or forthright to effect a discrimination.... This case exemplifies the fact that discrimination may arise just as surely through 'subtleties of conduct' as through an openly expressed refusal to serve." 54 Wash.2d at 444, 341 P.2d at 862.

Here, the "subtleties of conduct" were calling the police and having them, along with store personnel, follow Mr. Baram and his relatives as they attempted to shop.

In a more recent case, *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir.1979), the court gave this admonition which the majority regrettably has overlooked:

"'As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared.' [*Metropolitan Hous. Dev. Corp. v.] Village of Arlington Heights*, [558 F.2d 1283, 1290 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978)]. It means that when a discriminatory effect is present, the courts must be alert to recognize means that are subtle and explanations that are synthetic."

These statements are not arcane points of law. They rest upon the common sense notion understood by everyone, that antidiscrimination laws are directed not only at the blatantly obvious, but also "at subtle and covert activities designed to defeat its policy." *Wilson v. Sixty–Six Melmore Gardens*, 106 N.J.Super. 182, 185–86, 254 A.2d 545, 546 (1969). In *Wilson*, a housing discrimination case, the court concluded:

"The deliberate use of tactics of discouragement, whether by delay, credit investigations, withholding of material information, or by more subtly suggesting the applicant is unwelcome, consti-

tutes a violation of the statute if the practice is applied selectively to a particular unwanted race[.]"

*See also Heights Community Congress v. Hiltop Realty, Inc.*, 774 F.2d 135 (6th Cir. 1985), *cert. denied*, 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 (1986); *Marable v. H. Walker & Associates*, 644 F.2d 390 (5th Cir.1981); *Bryan v. Commonwealth Pennsylvania Human Relations Comm'n*, 45 Pa.Cmwlth. 125, 404 A.2d 1368 (1979).

It seems to me that a powerful disincentive is created against a shopper when he encounters the police watching him as he goes into the store and is followed by the police and store personnel as he travels about the store. The message is not even subtle, it is forceful and distinct: "You are not welcome." As a consequence, the individual does not shop. When such an individual is within the protected class, as the Barams unquestionably are,[3] this is discrimination. As earlier noted, an applicant for housing who is discouraged from applying by tactics of delay makes a case of discrimination. Here the tactic was not delay, but intimidation.

I must also reject the justification for these discriminatory acts offered by K–Mart and assiduously embraced by the majority, i.e., that the Barams fit some type of gypsy shoplifting profile. The majority overlooks the traditional rule stated in *Robinson*, 610 F.2d at 1040:

"In evaluating the proposed justifications, the district court must carefully scrutinize suggested reasons that are not objective in nature. In cases in which discriminatory intent could be inferred from the sequence of events, the courts have generally viewed subjective explanations with considerable skepticism. The wisdom in such skepticism is obvious. '*Any* defendant can respond to a discriminatory effect with a claim of some subjective preference or preroga-

---

**3.** The majority accepts the fact that the Barams were members of a protected class without any discussion. 181 W.Va. at 477, 383 S.E.2d at 281. The United States Supreme Court in *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), concluded that

racial discrimination is broad enough to include "ancestry" and "ethnic" characteristics. Arabs, even though they are a part of the Caucasian race, could nevertheless be the subject of racial discrimination.

tive and, if such assertions are accepted, prevail in virtually every case.' Comment, *Applying the Title VII Prima Facie Case to Title VIII Litigation,* 11 Harv.C.R.—C.L.L.Rev. 128, 182 (1976) (emphasis in original)."

Furthermore, it is settled law that in a public accommodation discrimination case, it is not necessary to prove that the defendant intended to be discriminatory. It is sufficient if an act of discrimination occurred.

The attempted justification in this case cannot be sustained for several reasons. The first is a factual one—the Barams plainly did not fit the gypsy profile. The only one who wore a flowing dress was Mr. Baram's wife. More importantly, as the California Supreme Court discussed in *Marina Point, Ltd. v. Wolfson,* 30 Cal.3d 721, 739, 180 Cal.Rptr. 496, 507, 640 P.2d 115, 125, *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982), it is not proper for a business to discriminate against a class of people because some members of that class have acted improperly in the past. An antidiscrimination statute does not foreclose a business enterprise from barring service to an individual on the basis of his own disruptive or unlawful conduct. However, as the *Wolfson* court stated, this "does not permit a business enterprise to exclude an *entire class* of individuals on the basis of a generalized prediction that the class 'as a whole' is more likely to commit misconduct than some other class of the public." (Emphasis in original).

Supporting this principle, and providing some factual analogy to the justification raised in this case, is *Lewis v. Doll,* 53 Wash.App. 203, 765 P.2d 1341 (1989). In *Lewis,* a black patron sued a 7–Eleven Store for refusing him service. The store owner's justification was that there had been a series of shoplifting incidents at the store involving blacks. Consequently, a policy had been developed not to serve any black people. The court rejected this justification defense because "refusal of service [can] apply only to situations where there is objective evidence a particular individual is engaging in or has in the past engaged in improper conduct. Refusal of service

cannot be predicated solely because of race." 53 Wash.App. at 210, 765 P.2d at 1345. Here, one need only substitute the word "gypsies" for "blacks" and the name "K–Mart" for "7–Eleven."

It does not take a vivid imagination to realize that the public accommodation statute can be virtually nullified if we permit a justification such as asserted in this case. It is quite simple to create any number of stereotypical profiles: white males with long hair or Italian-looking Mafia features, slender Oriental types with quick movements, Indians in soiled moccasins and dirty Levis, or country folk in bib overalls and muddy boots. If the owner reports that someone who fit that profile disrupted business or shoplifted in the past, the majority provides a ready template to deny service to all such individuals.

Finally, I must admit that the majority is not without some compassion. In its closing paragraph it warns, "we do not condone merchants calling the police at the sight of a person or party it believes a possible thief." 181 W.Va. at 479, 383 S.E.2d at 283. Unfortunately, this is exactly what it has condoned, and upon the basis of a racial motive. If those in Mr. Baram's group had had white skin and blond hair, instead of dark skin and black hair, this incident would never have occurred. I, therefore, dissent.