688 S.E.2d 915

**CHARLESTON TOWN CENTER COMPANY, LP, Appellant**

v.

The **WEST VIRGINIA HUMAN RIGHTS COMMISSION** and Steven and Cynthia Bumpus, on behalf of Steven M. Bumpus, a Minor, Appellees.

Charleston Town Center Company, LP, Appellant

v.

The West Virginia Human Rights Commission and Augusta Robinson, on behalf of Kevin Streets, a Minor, Appellees.

Nos. 34739, 34740.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 2009.

Decided Nov. 17, 2009.

L. Kevin Levine, Esq., Constance H. Weber, Esq., Anne L. Haight, Esq., Kay, Casto & Chaney, Charleston, WV, for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Paul R. Sheridan, Esq., Deputy Attorney General, Charleston, WV, for Appellees.

Terri S. Baur, Esq., Charleston, WV, for Amicus Curiae, ACLU.

Walt Auvil, Esq., Rusen & Auvil, Parkersburg, WV, for Amicus Curiae, WV Employment Lawyers' Association.

Robert M. Bastress, Jr., Esq., Law Office of Robert M. Bastress, Jr., Morgantown, WV, and Elliot G. Hicks, Esq., Spilman Thomas & Battle, Charleston, WV, and Sarah Crawford, Esq., pro hac vice, Jerry Jackson, Esq., pro hac vice, Noel Symons, Esq., pro hac vice, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for Amici Curiae, Lawyers Committee for Civil Rights Under Law, Mountain State Bar Association, and WV State Conference of the NAACP.

**PER CURIAM:**

This case involves two consolidated appeals by the Charleston Town Center Company, LP of the West Virginia Human Rights Commission's November 26, 2008, final orders which adopted the Administrative Law Judge's final decisions dated May 23, 2008. In its orders, the Human Rights Commission found that Charleston Town Center, LP discriminated against the appellees based on their race. Upon review of the record before the Human Rights Commission and the briefs and arguments of counsel, we reverse the Human Rights Commission's final orders for the reasons provided below.[1]

## I.

### FACTS

Separate complaints were filed with the West Virginia Human Rights Commission on behalf of the appellees herein, Steven Bumpus and Kevin Streets, in which it was alleged that the appellees were discriminated against by the Appellant Charleston Town Center Company, LP, based on their race which is African–American.[2] The Charleston Town Center, LP operates the Charleston Town Center ("Town Center" or "Mall"), a retail shopping mall in downtown Charleston. The appellees alleged in their complaints that they were unlawfully discriminated against by Town Center security guards. At a hearing before the Administrative Law Judge ("ALJ"), the following evidence was adduced.

On the evening of April 22, 2006, Mr. Bumpus, who was sixteen years of age at the time, and Mr. Streets, who was seventeen years of age at the time, along with a friend

---

1. We wish to acknowledge the contributions of amici curiae who filed briefs in this case, ACLU, West Virginia Employment Lawyers Association, Lawyers' Committee for Civil Rights Under Law, Mountain State Bar Association, and West Virginia State Conference of the NAACP.

2. Although originating as separate Human Rights Act complaints, the two cases were heard and considered together by the Human Rights Commission.

who is also African–American, entered the Charleston Town Center. The appellees testified that almost immediately upon entering the Town Center, several Mall security guards began watching them. In response to this testimony, Lt. Karl Hager, the Superintendent of Mall security,[3] testified that on the evening in question, two security guards were posted on level one of the Mall, one patrolling from Court Street to Starbucks and the other patrolling from Starbucks to Clendenin Street.[4] According to Lt. Hager, generally two security guards are not together in one place.

Subsequently, Mr. Bumpus and Mr. Streets were among a group of seven or eight African–American male youths who were sitting around different tables at the food court in the Town Center. The youths were approached by Lt. Hager who told them to leave the food court because they did not have food or drinks. There is divergent testimony on the issue of whether any of the youths were eating. Lt. Hager testified that he did not observe any members of the group eating. Mr. Bumpus and Mr. Streets testified, on the other hand, that some members of the group had purchased food. The youths refused to leave the food court as instructed and some of the youths called Lt. Hager a "rent-a-cop." At that point, Lt. Hager summoned two City of Charleston police officers who were eating in the food court. One of the youths initially refused to leave when commanded to do so by the police officers but eventually acquiesced.

Upon leaving the food court and traveling down to the second level of the Mall,[5] Mr. Bumpus testified that he, Mr. Streets, and two friends from the food court were walking around when they were approached by an unidentified Mall security guard and instructed to keep moving. Mr. Bumpus further testified that they were not blocking traffic at that point.

Next, just before 9:00 p.m. that evening, Lt. Hager again confronted a group of African–American youths, including the appellees, and instructed them to leave the Town Center. Again, there is conflicting evidence with regard to this occurrence. Mr. Bumpus testified briefly that he, Mr. Streets, and others were walking through the Mall when several city police officers approached them and told them to leave the Mall without explaining why. Mr. Streets appeared to testify that they were told to leave the Mall because the stores were closing. Lt. Hager testified that the appellees were in a loud group of about seven individuals. He further testified that he informed them that the Mall was closing, but that the group refused to leave, cursed at him, and called him a rent-a-cop. When the youths refused to leave, Lt. Hager again called for city police officers who subsequently escorted the youths from the Town Center.

The appellees and two friends then walked from the Town Center to a movie theater located several blocks away. They ultimately did not see a movie and walked back to Chili's restaurant, which is attached to the Mall but contains a separate outside entrance. They remained at Chili's for more than an hour, eating and watching television. Upon exiting the restaurant, the youths walked to a railing located just outside of Chili's where Mr. Bumpus telephoned his mother for a ride home. At that point one of the appellees' friends left, leaving three youths remaining along the railing.

When the appellees and their friends exited Chili's, there was a verbal confrontation occurring between a large group of African–American males and Town Center security guards somewhere between the Mall's Court Street entrance and Chili's. At some point, Town Center security called the city police. After identifying the appellees as being part of the group that confronted the security guards, a security guard notified the appellees that they should leave the Mall property

---

3. Lt. Hager testified that Town Center security guards are hired through a company known as U.S. Security Services.

4. The Town Center is bordered on the east by Court Street and on the west by Clendenin

Street. Starbucks is located in the center of the Mall.

5. The Charleston Town Center has three levels. The first two levels contain retail stores, and the third level is the food court.

before the police arrived, but the appellees refused. By the time the police officers arrived, the large group of individuals had dispersed, but the appellees and a friend remained at the rail near Chili's restaurant. After the appellees argued with the police officers, they were arrested and charged with trespassing. This charge was later dropped.

After the evidentiary hearing, the ALJ entered a final decision in each case[6] in which he found that each appellee was subjected to a severe incident of racial harassment by agents of the Town Center.[7] The Human Rights Commission adopted the ALJ's orders. This Court granted the Town Center's petition for appeal and consolidated the cases for review.

## II.

### STANDARD OF REVIEW

This case involves an appeal directly from the Human Rights Commission to this Court. Concerning such appeals, this Court has held:

> Where an appeal from an order issued by the West Virginia Human Rights Commission is brought directly to the West Virginia Supreme Court of Appeals, pursuant to W. Va.Code § 5–11–11 (1989), this Court will apply the same standard of review that is applied to Human Rights Commission orders appealed to a circuit court.

Syllabus Point 1, *Cobb v. West Virginia Human Rights Com'n*, 217 W.Va. 761, 619 S.E.2d 274 (2005). With regard to the standard of review applied by a circuit court to Human Rights Commission orders, we have indicated that "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." Syllabus Point 1,

*Human Rights Com'n v. United Transp. Union # 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981). Finally, we have held:

> Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Syllabus Point 2, *Shepherdstown V.F.D. v. W. Va. Human Rights*, 172 W.Va. 627, 309 S.E.2d 342 (1983). With these standards to guide us, we now consider the issues in this case.

## III.

### DISCUSSION

The sole question in this case is whether the ALJ erred in finding that the appellees proved that they were victims of unlawful discrimination. This case arises under our State Human Rights Act which makes it an unlawful practice, in pertinent part, "[f]or any persons being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public

---

**6.** The ALJ's final decisions are essentially identical to each other.

**7.** In his order, the ALJ ordered the Town Center to cease and desist from engaging in unlawful discriminatory practices. He further ordered the Town Center to pay costs of $1,358.50 in the prosecution of this matter, and to pay the appellees incidental damages in the amount of $5,000 for humiliation, embarrassment, emotional dis-

tress, and loss of personal dignity suffered as a result of the unlawful discrimination. Finally, he directed the Town Center to implement training of its contracted mall security personnel to refrain from engaging in racial profiling and to include sensitivity training regarding individuals belonging to classes protected under the West Virginia Human Rights Act.

accommodations to ... [r]efuse, withhold from or deny to any individual because of his or her race ... any of the accommodations, advantages, facilities, privileges or services of the·place of public accommodations[.]" W. Va.Code § 5–11–9(6)(A). Once a complainant proves a *prima facie* case of unlawful discrimination,[8] "[t]he complainant's prima facie case can be rebutted if the respondent presents a nondiscriminatory reason for the action in question sufficient to overcome the inference of discriminatory intent." [9] Syllabus Point 2, *K–Mart Corp. v. Human Rights Com'n*, 181 W.Va. 473, 383 S.E.2d 277 (1989) (footnote added).

■ This Court finds that the Town Center successfully rebutted the appellees' *prima facie* case. In the instant case, the Town Center presented evidence showing that the appellees' behavior violated the Town Center's code of conduct. Lt. Hager testified below that a copy of the code of conduct is located at the bottom of each escalator on the second and first floors of the Mall. This code of conduct provides as follows:

● **Juvenile** groups of four (4) or more will be dispersed. Customers must keep moving in an orderly fashion through the premises and not block walkways or store entrances.

● **Seating** benches are to be used for shopping breaks not to exceed 15 minutes.

● **Food** Court seating is for paying customers of the Food Court.

● **Loud** and boisterous behavior will not be permitted.

● **Obscene** or offensive language will not be permitted.

● **Spitting,** sitting in the planters, leaning on railings or throwing objects over them will not be permitted.

● **Running,** inappropriate behavior, vandalism or any unacceptable conduct on the premises will be grounds for ejection.

● **When** conditions contribute to an overflow of juveniles, management reserves the right to disperse or eject individuals or groups.

● **Proper** clothing is required at all times, which includes shoes, shirts and no gang attire or colors.

● **Individuals** of school age are expected to be in attendance at school during the hours their schools are in session or otherwise in transit to or from home.

### Violators Will Be Asked To Leave The Property

Specifically, the Town Center provided evidence below that the appellees were approached by Lt. Hager at the food court because they were being loud. Lt. Hager then instructed the appellees and their friends to leave the food court because they were not paying customers. Further, the Town Center presented evidence that the appellees were directed to leave the Town Center because they were being loud and the Mall was closing. Finally, evidence produced by the Town Center indicated that the appellees were told to leave Town Center property on the sidewalk outside of Chili's because they were identified as being in a large group of individuals who were being disruptive.

■ Once the defendant articulates a nondiscriminatory reason for its conduct, the plaintiff bears the burden of showing that the reason articulated for the conduct is pretextual, and that race was the actual motive for the conduct. According to Syllabus Point 3 of *K–Mart, supra,* this Court held that "[t]he complainant may still prevail if it can be shown that the reason given by the respon-

---

8. This Court has held:
 In order to make a prima facie case of discrimination in a place of public accommodation, the complainant must prove the following elements:
 (a) that the complainant is a member of a protected class;
 (b) that the complainant attempted to avail himself of the 'accommodations, advantages, privileges or services' of a place of public accommodation; and

(c) that the 'accommodations, advantages, privileges or services' were withheld, denied or refused to the complainant. Syllabus Point 1, *K–Mart Corp. v. Human Rights Com'n*, 181 W.Va. 473, 383 S.E.2d 277 (1989).

9. The first assignment of error raised by the Town Center is that the appellees failed to prove a *prima facie* case of unlawful discrimination. For purposes of this appeal we will presume that the appellees proved their *prima facie* case.

dent is merely a pretext for a discriminatory motive." Courts have indicated that several types of evidence can be used by a plaintiff to prove pretext. These include: "1) comparative evidence; 2) statistical evidence; and 3) direct evidence of discrimination, in the form of discriminatory statements and admissions." *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (1985) (citation omitted). In their testimony below, the appellees made vague references to white youths who were treated differently than the appellees were. However, no evidence was presented that these white youths were violating the code of conduct at that time. Absent such evidence, the appellees are unable to show that the code of conduct was enforced against them in a discriminatory manner. The appellees also presented the testimony of Carol Johnson Cyrus, the aunt of one of the appellees' friends, that when she called the Mall to complain about the appellees' treatment, the person who answered the phone for Mall security told her that "[security guards] don't just bother African Americans, they also get on Goths, you know, the white people that wear black clothing." We find, however, that an ambiguous statement from an unidentified person is of little probative value in determining the security guards' motives for their actions against the appellees. In addition, the appellees elicited the testimony of Charleston Police Officer Robert Brown who testified that of the "probably more than a hundred" calls he has responded to in the last thirteen years to eject people from the Mall, "probably about close to a hundred percent ... have been minorities or blacks." Similarly, Charleston Police Officer Raymond Coleman testified that the individuals he is called to the Town Center to evict are commonly African–American. However, the general recollection of two police officers over a relatively long period of time absent supporting documentation and additional evidence of the total number of police evictions made at the Town Center over the same time period does not permit a meaningful comparison of Mall security's treatment of African–

Americans versus its treatment of persons of other races. For these reasons, we conclude that the above evidence relied upon by the appellees to support their claims is insufficient to prove unlawful discrimination in the present case.

 A fourth way for plaintiffs in an unlawful discrimination claim to prove their case is by showing that the reason articulated by the defendant for the action taken against the plaintiff is not credible. This Court has indicated that "[i]n order to overcome a showing of non-discriminatory reason, the complainant must demonstrate *by a preponderance of evidence* that the claimed non-discriminatory reason was merely a pretext. Pretext may be demonstrated by showing that the articulated reasons were implausible." *Cobb*, 217 W.Va. at 774–775, 619 S.E.2d at 287–288 (citations omitted; emphasis in the original). In finding for the appellees, the ALJ below specifically found that the reasons offered by the Town Center for its treatment of the appellees were not credible. We will now review the ALJ's bases for this finding.

First, the ALJ states that he cannot discern any misbehavior or violation of the code of conduct to explain the fact that the appellees were subjected to being watched and followed by Mall security guards upon entering the Mall.[10] Presuming that this testimony of the appellees is true, despite the fact that it was disputed by the Town Center, such conduct would not support a claim under the Human Rights Act. This Court previously has found that merely observing entrants to a business establishment cannot sustain an unlawful discrimination claim. Specifically, in *K–Mart v. Human Rights Com'n, supra,* we concluded with regard to a Syrian family's complaint that they were watched by employees and a police officer while shopping at K–Mart, "nowhere in the record do we find that the appellant and his family were actually denied, refused, or withheld any services or amenities as required by W. Va.Code § 5–11–9[.]" 181 W.Va. at 478, 383 S.E.2d at

---

10. In this instance, the ALJ relies primarily on the testimony of Mr. Bumpus's mother that her son called her upon entering the Mall and complained that he was being watched by security guards. Ms. Bumpus's testimony that her son called her shortly after he entered the Mall is consistent with a cellular phone record entered into evidence.

282. In their brief to this Court, the appellees aver that while such conduct alone may not constitute a valid claim under the Human Rights Act, it indicates that race was a factor in how the appellees were perceived and supports the ALJ's finding that the appellees were discriminated against based on their race. However, because we conclude that there is no additional evidence of unlawful discrimination, evidence that the appellees were watched is not sufficient to prove pretext.

As a second basis for its finding of pretext, the ALJ placed great weight on Lt. Hager's testimony that generally he will explain to people how they are violating the code of conduct and suggest how they may comply with the code to alleviate the problem.[11] However, Lt. Hager testified that he did not explain to the appellees at the food court that if they quieted down or purchased food they could stay. This Court's review of the record indicates, however, that Lt. Hager explained that he did not utilize this practice with the group at the food court because some members of the group immediately became belligerent. Further, Mall security guards are afforded considerable discretion in their application of the Mall's code of conduct depending on several factors in any given circumstance such as the size of the group of juveniles, the group's conduct, the group's attitude and demeanor, and the condition of the mall, i.e., how crowded the Mall is. It is undisputed that the appellees were in a group of seven or eight individuals, at least several of whom were not paying customers of the food court. It is also undisputed that the group refused to leave the food court when instructed to do so by Lt. Hager. Therefore, under these facts, we find that the alleged inconsistency in Lt. Hager's treatment of the appellees creates no inference

that he acted in a racially discriminatory manner.

As a third basis for his decision, the ALJ indicates that

There is no rule which prohibits window shopping, yet Complainants were approached and told they had to keep moving. The same thing occurred when Complainants were escorted out of the Mall. They were asking why are we being asked to leave now, when everyone else is being left alone to leave on their own? No explanation; again a call for the Charleston Police Department to remove them from the premises while other members of the public were not.

The ALJ's analysis is problematic for several reasons. First, while there is no rule that prohibits window shopping, the code of conduct provides that "Customers must keep moving in an orderly fashion through the premises and not block walkways or store entrances." While the appellees testified in cursory fashion that they were not blocking traffic, the fact remains that Mall security has the discretion to enforce the code of conduct in accord with Mall conditions. Absent additional details about this alleged occurrence, it cannot be inferred that the unidentified security guard had an unlawful motive for his conduct.

The ALJ explains the final basis for its decision as follows:

Finally, there is the incident outside of Chili's restaurant, which resulted in the arrest of Complainants for trespass. Lt. Hager associated Complainants with the group that was causing trouble that night outside the Mall entrance simply because they were African–American teenagers. Should Complainants have been white, Lt. Hager would not have instructed Charleston City Police to remove them from the

---

11. Similarly, in their brief, the appellees point to Lt. Hager's testimony in which it appears that he is confused as to whether the code of conduct provides that groups of four or more juveniles or groups of more than four juveniles will be dispersed. According to the appellees, this confusion seriously undermines Lt. Hager's claim to consistent enforcement of the rules. We disagree. Under the instant facts, any confusion on Lt. Hager's part on this issue is immaterial. It is undisputed that the appellees were in a group of

seven or eight persons at the food court, and Lt. Hager indicated at that time that they had to leave the food court because they were not paying customers. It was Lt. Hager's testimony that he subsequently approached the appellees because they were in a group of about seven, they were being loud, and the Mall was closing. Finally, concerning the incident outside of Chili's restaurant, security guards identified the appellees as being part of a group of approximately fifteen African–American males.

sidewalk just because they were outside Chili's restaurant. Only because Complainants had questioned the treatment they were receiving from Mall security and him specifically earlier in the evening, Lt. Hager pointed them out to Charleston City Police and directed that they be told to go somewhere which placed them in danger, when they were entitled to stay right where they were. That insistence resulted in their arrest, which Respondent now claims is the result of Complainant's own behavior, completely disowning their responsibility in the events.[12] (Footnote added).

For the following reasons, we find the ALJ's conclusion that the incorrect identification of the appellees with the larger group of African–American teenagers proves racial animus to be speculative.

It is undisputed that there was a large group of African–American males, perhaps 15 to 20, confronting Mall security guards somewhere between the Mall entrance on Court Street and Chili's restaurant during the time the appellees exited Chili's and proceeded to stand at a rail along the front of the restaurant. At some point, the larger group migrated in the direction of the appellees so that the appellees were among the larger group. Mr. Streets testified to this facts as follows:

A. We just started walking out, and we saw other teenagers, African–American, standing right under that Town Center Mall [sign] and they was [sic] just running around, playing around, and then you could see as they started having a confrontation with the security guards. And we just stood there waiting for [Mr. Bumpus's] mom. And we just set [sic] there and pretty much watched what was going on. And then as they started confronting, it seemed like more, it seemed like some of them eased their way over here and then we became part of their group and the security guard said everybody needs to leave, even though we just stood there and we weren't part of it at all. And we just—

and then the same thing, we just watched as it kept going on.

Q. Okay. And then what happened?

A. Then they kept getting in it. Threats were being made to each other and—

Q. When you say "threats being made to each other"?

A. From the other teenagers and the security guards. And they, then they said the police are coming now, so we'll see how you all act when they come. Then that's when we hear the sirens and stuff going off and they all just run.

Q. Who ran?

A. All those teenagers of African–American blood, all of us except for me, [Mr. Bumpus], Larry, and Lamar had already gone. So they all left and it was just me, Steven, and Larry.

Under these facts, it does not follow that the security guards' identification of the appellees with the larger group of individuals proves racial animus. Rather, according to the evidence, the action taken against the appellees by the security guards was based on the guard's belief that the appellees had violated the code of conduct by being among a large group that was being disruptive. The fact that the security guards believed this in part because the appellees were of the same race as the members of the larger group is not evidence of racial animus against the appellees.

These facts are similar to those in *K–Mart v. Human Rights Com'n, supra,* wherein a family of Syrian descent who were watched by employees and a police officer because they fit the profile of a band of gypsy shoplifters filed a claim under the Human Rights Act alleging discrimination based on national origin. As discussed above, this Court found that the complainants in *K–Mart* failed to show a *prima facie* case of unlawful discrimination because they were not actually denied, refused, or withheld any services or amenities as required by the Human Rights Act. Significantly, this Court went on to find that

12. Despite the ALJ's finding that it was Lt. Hager's insistence that resulted in the appellee's arrest, Police Officer Shawn Midkiff testified that

the appellees were instructed by a police officer more than three times to leave the area before the arrests for trespassing.

Even assuming, however, that the complainant had made a prima facie case of discrimination, we believe that the appellee demonstrated a legitimate, nondiscriminatory reason for its actions. K–Mart points to its previous experience with shoplifting bands, the warning call it received in the week prior to the incident, and its obligation to protect both its customers from danger and its inventory from shrinkage. 181 W.Va. at 478, 383 S.E.2d at 282. This Court then concluded that "the chance fact the family group fit the profile of the shoplifting band precipitated the police summons [to watch the complainants], not discrimination." *Id.* Similarly, in the instant case, the fact that the appellees were of the same race of and were actually among the group of offenders caused the security guards to identify the appellees as being a part of the group. The fact that the individuals in the larger group were disbanded due to their number and their conduct constitutes a legitimate, nondiscriminatory reason for the security guards' actions. Further, the fact that the security guards presumed that the appellees were members of the group due to their race and the fact that they were among the group is not unreasonable under the circumstances and does not raise an inference of racial animus. Therefore, for the reasons stated above, we conclude that the evidence relied upon by the ALJ in his decision is insufficient to prove by a preponderance of the evidence that the appellees were discriminated against based on their race.[13]

■ Our conclusion with regard to the evidence relied on by the ALJ is supported by other evidence of record. The appellees cannot seriously dispute that they were in violation of the code of conduct on the date of the incidents in question. Specifically, the evidence shows that the appellees were among a group of seven or eight youths in the food court, several, if not all, of whom were not paying customers of the food court. When the appellees were asked to leave the Mall around closing time, they were in a group of at least four. Finally, it is undisputed that the appellees were identified as

being among a large group of individuals outside of Chili's who were disruptive and argumentative with security guards. This Court has recognized that "[d]iscipline imposed upon a minority [ ] does not alone equate to racial discrimination unless there is a preponderance of evidence that the discipline was imposed in a discriminatory manner or for a discriminatory purpose." *Cobb,* 217 W.Va. at 776, 619 S.E.2d at 289. Further, Mr. Bumpus testified that he had been to the Town Center hundreds if not thousands of times before the events at issue, apparently without an occurrence similar to the ones in this case. This Court previously has indicated that such evidence significantly weakens a claim of unlawful denial of access to public accommodations. *See K–Mart,* 181 W.Va. at 478, 383 S.E.2d at 282 (finding that "the [complainants'] allegations that their garb and skin tone precipitated the police summons were weakened by their admission that they shopped at that K–Mart without incident for an extended period prior to [the date of the alleged discrimination]"). Finally, Charleston Police Officer Keith Peoples who, in addition to being a police officer, had provided security at the Town Center for almost 16 years, stated that he had never been aware of security guards referring to African–American youth in derogatory terms and never witnessed African–American youth being harassed or mistreated by Mall security.

In addition, we find that the ALJ's weighing of the evidence below is arbitrary. First, the ALJ ignores the cursory and nonspecific testimony of the appellees as it relates to the occurrences which form the bases of the appellees' claims. Second, the ALJ disregards material discrepancies in the appellees' testimony. For example, Mr. Bumpus provided general testimony with regard to the incident at the food court that his friends were eating food from the Subway restaurant, he had purchased a cookie from Subway, and Mr. Streets also had purchased food. Mr. Streets testified, in contrast, that an individual named Keith Harris and two others had purchased food, but that Mr.

---

**13.** There is also evidence that Lt. Hager recognized the appellees from his encounters with them or the group they were in earlier in the evening.

Streets had not purchased any food. He also did not indicate that Mr. Bumpus had purchased food. In addition, with regard to the appellees' eviction from the Mall, Mr. Bumpus testified in very cursory fashion that several police officers escorted them from the Mall, and he does not indicate that a Mall security guard was involved in the eviction. Specifically, he states that "we were going around on the first floor, and I guess they had radioed police or whatever and they came up to us and told us that they were escorting us out of the mall without any explanation." Mr. Streets appears to testify, however, that the appellees were informed, apparently by security guards, that the Mall was closing down and they needed to leave. Also, Mr. Streets' testimony concerning whether the Mall was closing when they were asked to leave is ambiguous. Specifically, Mr. Streets testified as follows:

Q. Okay. And you say things were closing down?

A. Yes.

Q. Okay. So the stores inside the mall were closing?

A. Well, at the time, you didn't see, because from where I've been there now, you see gates closing, you didn't see it real thinned out. You still seen everything open, but I guess from the time they just, I guess from the time it was being, they told us we needed to leave, even though I still didn't—I still seen other people there. So it became like an argument, why did we specifically need to leave, and that was like a concern and kind of just, we just want to know why. And it never got answered, we just got escorted out.

These discrepancies in testimony are material to the issues of the appellees' conduct at the time action was taken against them by the security guards as well as the legitimacy of the action taken against the appellees

Another indication of the ALJ's arbitrariness is the fact that the ALJ credits in every single instance the uncorroborated testimony of the appellees as it relates to the conduct of Mall security guards and police officers. Examples include the ALJ's statement that Lt. Hager "allowed the police to bully" one of the individuals who was with the appellees' group

at the food court; the ALJ's indication that one of the police officers involved in the appellees' arrest "was clearly out of control, acting in an irresponsible fashion;" the ALJ's contention that "[t]he plain clothes officer was hostile and belligerent toward the [appellees]; and the ALJ's opinion that the [Town Center] really objects to Complainants 'running the Mall[,]' which in reality means nothing more that 'hanging out at the Mall' which is apparently alright as long as you're an off duty white Mall security officer." The ALJ's fact-finding in this regard is especially noteworthy in light of the undisputed fact that the appellees and/ or their friends were argumentative and recalcitrant toward Mall security on two occasions, and that the appellees' demeanor toward city police officers resulted in the their arrests.

Finally, it is significant that the ALJ, without exception, excuses or finds irrelevant evidence of misconduct on the part of the appellees. For example, while acknowledging Mr. Streets' admission that he "had words" with a police officer outside of Chili's restaurant, the ALJ credits Mr. Streets' explanation that his outburst was caused by the fact that he was "astounded by the way [the appellees] were being treated, and it made him angry." Elsewhere, the ALJ characterizes Lt. Hager's testimony that the appellees' group "mouthed" him as actually amounting to nothing more than the appellees protesting and questioning how they were being treated. Finally, the ALJ sarcastically comments that when told to leave the Mall, the appellees "had the unmitigated gall to mouth Lt. Hager, by asking why this was being done."

Based on the above, we find that the ALJ's decision is clearly wrong in view of the reliable, probative, and substantial evidence on the whole record. Further, we find the ALJ's fact finding to be arbitrary. Finally, this Court finds that the ALJ's decision is tainted by a hostility and sarcasm toward the Town Center and its agents that casts doubt on the ALJ's fairness in deciding the instant case.

Prior to concluding, we deem it necessary to briefly address the arguments proffered by the appellees in support of the ALJ's decision. First, the appellees cite from the

record alleged evidence of inconsistencies pertaining to Lt. Hager's version of the incident at the food court. Specifically, the appellees cite an answer to an interrogatory produced by the Town Center in which it is asserted that Lt. Hager approached the appellees' group in response to a food vendor's complaint that the group was being disruptive which, say the appellees, is inconsistent with Lt. Hager's testimony that he approached the group after he witnessed them being disruptive.[14] We note, however, that Lt. Hager explained that after the youths left the food court, one of the vendors indicated to Lt. Hager that he had planned to complain to security about the group's conduct. The appellees also refer to a supplemental report completed by Lt. Hager five months after the incidents at issue wherein he recorded about the food court incident that "a large group of black males ... were playing around and yelling." Our review of this report also indicates, however, that Lt. Hager wrote in that same sentence that "I asked them to leave food court *if they were not eating.*" (Emphasis added.). Far from being contradictory, the reports and testimony cited by the appellees are consistent with the fact that a group of seven or eight individuals, including the appellees, were initially approached by Lt. Hager for being loud and were subsequently instructed to exit the food court because they were not paying customers. There simply is no basis on which to infer racial animus from this evidence.

In addition, the appellees assert in their brief that

There is also a complete lack of corroboration for Lt. Hager's version of events, notwithstanding that security guard David Gandee was there at the food court, at least for the end of the incident and Charleston Police Department Officers Midkiff and Ross were integrally involved in the eviction. The Charleston Town Center Mall chose not to call Gandee and Ross to testify. And Midkiff, who was

called as a witness by the Commission, could not corroborate Hager's version of events.[15] There was no testimonial or written evidence of a disturbance provided from the manager of Best of Crete, who allegedly complained about a disturbance. (Citations omitted and footnote added).

The problem with the appellees' argument is that it seems to ignore the fact that the appellees had the burden of proving unlawful discrimination. Once the Town Center explained that the treatment of the appellees was based on their violation of the code of conduct, it was incumbent upon the appellees to prove that the actual reason for their treatment was racial animus. In other words, the appellees were charged with producing evidence, not speculation, including corroborating evidence, sufficient to show that racial animus was more likely than not the reason for the action taken against them. In light of this fact, it is more remarkable that the appellees did not call David Gandee or others to corroborate the appellees' version of events.

## IV.

## CONCLUSION

For the reasons stated above, we find the Human Rights Commission's rulings to be clearly wrong in view of the reliable, probative, and substantial evidence on the whole record and affected by arbitrary findings of fact. Accordingly, we reverse the November 26, 2008, orders of the Human Rights Commission.

No. 34739—Reversed.

No. 34740—Reversed.

---

14. Lt. Hager's Daily Activity Record completed on April 22, 2006, simply indicates that he "Asked large group of kids to leave food court they refused had to get P.D. officer to make them leave."

15. In fact, according to the transcript, Officer Midkiff testified that he remembered nothing about encountering any juveniles in the food court that day.