IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2020 Term

_____

No. 18-1104

_____

FILED
October 16, 2020
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

McCLURE MANAGEMENT, LLC and
CINDY KAY ADAMS,
Petitioners

v.

ERIK TAYLOR and
JAMES TURNER,
Respondents

_____

Appeal from the Circuit Court of Ohio County
The Honorable Jason A. Cuomo, Judge
Civil Action No. 12-C-287

AFFIRMED

_____

Submitted: September 23, 2020
Filed: October 16, 2020

David L. Delk, Esq.
Grove, Holmstrand & Delk, PLLC
Wheeling, West Virginia
Counsel for Petitioners

Patrick S. Cassidy, Esq.
Timothy F. Cogan, Esq.
Irvin N. Shapell, Esq.
Cassidy, Cogan, Shapell &
Voegelin, LC
Wheeling, West Virginia
Counsel for Respondents

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.     "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

2.     "When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the West Virginia Rules of Civil Procedure [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented.  Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below.  Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party."  Syl. Pt. 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

3.     "In order to make a prima facie case of discrimination in a place of public accommodation, the complainant must prove the following elements: (a) that the complainant is a member of a protected class; (b) that the complainant attempted to avail himself of the 'accommodations, advantages, privileges or services' of a place of public accommodation; and (c) that the 'accommodations, advantages, privileges or services' were withheld, denied or refused to the complainant." Syl. Pt. 1, *K-Mart Corp. v. Human Rights Comm'n*, 181 W. Va. 473, 383 S.E.2d 277 (1989).

4. "Whether a plaintiff will be allowed to introduce further evidence after the evidence in behalf of a defendant is concluded is ordinarily within the discretion of the trial court, and the exercise of such discretion will rarely constitute ground for reversal." Syl. Pt. 10, *Edmiston v. Wilson*, 146 W. Va. 511, 120 S.E.2d 491 (1961).

5. "Under Rule 611(a) of the West Virginia Rules of Evidence, a trial court has broad discretion in permitting or excluding the admission of rebuttal testimony, and this Court will not disturb the ruling of a trial court on the admissibility of rebuttal evidence unless there has been an abuse of discretion." Syl. Pt. 2, *Belcher v. Charleston Area Med. Ctr.*, 188 W. Va. 105, 422 S.E.2d 827 (1992).

6. "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl. Pt. 1, *Addair v. Majestic Petroleum Co., Inc.,* 160 W. Va. 105, 232 S.E.2d 821 (1977).

ARMSTEAD, Chief Justice:

Respondents, Erik Taylor ("Mr. Taylor") and James Turner ("Mr. Turner"), brought a discrimination lawsuit under the West Virginia Human Rights Act ("WVHRA"),[1] against Petitioners, McClure Management, LLC ("McClure Hotel" or "hotel"), and Cindy Kay Adams ("Petitioner Adams"). The jury found in favor of Respondents and awarded each of them $475,000.00. Following the trial, Petitioners filed a motion for judgment as a matter of law, or, alternatively, a new trial. The circuit court denied this motion by order entered on October 25, 2018.

On appeal, Petitioners argue that: 1) Respondents "failed to present evidence that the Petitioners violated the [WVHRA] and denied the Respondents accommodations of the hotel in any way;" 2) the circuit court erred by allowing Respondents to call a rebuttal witness to testify about comments Petitioner Adams made; and 3) the jury's verdict was excessive. After review, we find no error, and therefore affirm the circuit court's October 25, 2018, order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Taylor and Mr. Turner are African American men who were employees of Price Gregory International, Inc. ("Price Gregory") when the relevant events in this matter occurred. Price Gregory is a company involved in the natural gas industry. Mr.

---

[1] *See* W. Va. Code § 5-11-1 *et seq.* (1967).

Taylor lives in California. Mr. Turner lives in Mississippi. Both men came to West Virginia to work as "pipeliners" at a gas production site operated by Price Gregory.

The instant matter arises out of their attempt to seek long-term apartment rooms at the McClure Hotel in Wheeling, West Virginia. Respondents filed their complaint against the McClure Hotel and an employee of the hotel, Petitioner Adams, alleging that their "actions in refusing, and/or withholding from [Respondents] the accommodations, advantages, facilities, privileges or services of their place of public accommodation constitutes unlawful discriminatory practices under West Virginia Code [§] 5-11-9(6)(A)."[2]

The jury trial began on July 23, 2018. Respondents' first witness was Mr. Taylor. He testified that he was working on a pipeline project in Tennessee for Price Gregory prior to coming to West Virginia. After finding out that his next project would be in West Virginia, Mr. Taylor stated that "I usually ask where's everybody staying at. And the majority of the people said we're staying at the McClure [Hotel]." Mr. Taylor proceeded to call the McClure Hotel and asked if they had long-term apartment rooms available. Petitioner Adams was the hotel employee who answered this call. Mr. Taylor testified that she told him that long-term apartment rooms were available. However, after arriving at the McClure Hotel in person and speaking with Petitioner Adams, Mr. Taylor

---

[2] Respondents also sued for defamation. That claim was not submitted to the jury, and has no bearing on this appeal.

2

stated that Petitioner Adams told him that there was a "waiting list" for the long-term apartment rooms, but he could stay in a "nightly room," which the hotel referred to as a "sleeper room." The "sleeper rooms" are more expensive on a nightly basis than the long-term apartment rooms.

Mr. Taylor testified that he observed white coworkers who were hired after him, and who arrived at the hotel after him, being provided with long-term apartment rooms while he remained in a "sleeper room." He explained that he knew who was "hired in what order pretty much from who's on site at the safety meetings and who's not there." Mr. Taylor approached Petitioner Adams and asked why these coworkers who were hired after him, and arrived at the hotel after him, were being provided with long-term apartment rooms when she had informed him that none were available. According to Mr. Taylor, Petitioner Adams told him that these coworkers were ahead of him on the "waiting list." Mr. Taylor testified that this could not have been the case because the coworkers had not yet been hired by Price Gregory when he arrived at the hotel. Regarding these coworkers, Mr. Taylor was asked "did you actually see that they had long-term apartments?" He replied: "Yes. Physically I visually viewed them. Because of the parking, there's only one place to park there, so we parked in the same area[.]"

After his conversation with Petitioner Adams, Mr. Taylor spoke with the hotel's general manager, Cindy Johnson. He told her that "there's coworkers at the site that got hired after me that are getting rooms before me, so what's the problem, I've been here before them." According to Mr. Taylor, Ms. Johnson told him that the hotel did not

3

have a "waiting list" and referred him back to Petitioner Adams. Mr. Taylor proceeded to speak with Petitioner Adams again, and she repeated her claim that there was a "waiting list." However, shortly after his conversation with the hotel's general manager, Mr. Taylor was provided with a long-term apartment room. He had been at the hotel for approximately two weeks before being provided with a long-term apartment room.

Next, Mr. Taylor described an interaction he had with Petitioner Adams regarding his hotel bill. Mr. Taylor acknowledged that, on one occasion, he paid the monthly apartment rent three days beyond the five-day grace period provided for in the apartment rental agreement; however, the hotel's policy provided that eviction would not occur unless a rental payment was ten days late. On the day he made this rental payment, December 8, 2011, he paid in cash and stated that the hotel made a photocopy of the money he handed them. Further, Petitioner Adams called him to inform him that, although he had paid his rent, he had a parking fee that remained outstanding. Mr. Taylor explained to her that he intended to "go to the bank and . . . take care of it" after work. According to Mr. Taylor, Petitioner Adams responded, "I've had nothing but problems from you people." Mr. Taylor asked Petitioner Adams what she meant by "you people." Although she did not directly respond, Mr. Taylor testified that he "knew what it meant because [he had] heard it so many times in [his] life."

Later that day, Mr. Taylor discovered that Petitioner Adams had called Price Gregory and spoken to his office manager. Mr. Taylor asked Petitioner Adams whether she made disparaging remarks about him to his office manager, but Petitioner Adams

4

"didn't have any response to that. She just sat there and looked at [me]." Petitioner Adams's phone call to Mr. Taylor's office manager also required Mr. Taylor to explain the situation at the hotel to his "spread boss." Mr. Taylor explained that the "spread boss" is the person in charge of a pipeline jobsite.

According to Mr. Taylor, he felt humiliation when discussing the hotel situation with his spread boss: "When [my spread boss] pulled me aside it was more embarrassing than anything else because of the simple fact that, you know, you're making me look bad, type thing, like I brought you to the job, how are you getting people calling here because you're not paying your bills." Mr. Taylor testified that after completing this particular job, he did not work for Price Gregory again.

At the conclusion of his testimony, Mr. Taylor was asked why he pursued this lawsuit. He replied:

> Honestly, the way I was raised was do the right thing, say the right thing, try to walk in a straight line. And it's something that you gotta [sic] stand up for when you're wronged. This was something that was just wrong in all kinds of ways. I think it was morally wrong. But at the end of the day it was something I was judged on for the color of my skin, not the content of my character.

He was asked if this experience caused him "any particular grief." Mr. Taylor stated:

> Embarrassment, humiliation. But as a black man in America, I see this on a daily basis, but you learn to live with it. If you don't like me for the color of my skin, I really don't have to deal with you on a daily basis. But when you impact me directly and you're trying to purposely harm me, then I have to stand up for that. It's like, no, I can't accept that, I'm

5

sorry. So that's why I came from L.A. to say it was wrong and we're not [going to] stand for it.

Mr. Turner also testified during Respondents' case-in-chief. He stated that, like Mr. Taylor, he was one of the first Price Gregory employees to arrive on the jobsite. Upon arriving at the McClure Hotel on October 26, 2011, Petitioner Adams informed him that there were no long-term apartment rooms available, but that he would be at the top of the "waiting list." Like Mr. Taylor, Mr. Turner was given a "sleeper room" and testified that "I agreed to pay the regular stay per night [for the 'sleeper room'], which is a higher rate, because I had nowhere else to go. So I just paid the regular rate until an apartment became available." Though he was one of the first Price Gregory employees to arrive, Mr. Turner testified that he observed white coworkers getting long-term apartment rooms before he did.[3] It took approximately one month from the time he arrived at the hotel until he was provided with a long-term apartment room.

When asked if he expressed his complaint about other employees getting long-term apartment rooms before he did to the Petitioners, Mr. Turner replied:

> A.    I did. I spoke with [Petitioner Adams] about it, and she referred – she kept telling me that, you know, I was still on the list and that when something came available that she would, you know, she would move me.
>
> Q.    Okay. What did she say when you told her that there were people moving in ahead of me?

---

[3] During cross-examination, Mr. Turner was asked if he could name the white coworkers who were given long-term apartment rooms before he was. He stated that he knew their first names but did not recall their last names.

A.      Well, she kind of got frustrated, as if I was being smart, maybe, the way I approached her.  I just told her that, you know, I know that some people had moved in before me, and I felt like that was unfair.  And I guess she took that as a dislike.

Q.      Why do you say that?

A.      Well, because of that she started asking me questions about me being a drug dealer, about why I got gold teeth and I work for a living and –
. . . .
Q.      In what context did it come up about whether or not you-

A.      Well, she said the last person that – when I got the apartment, she said the last person which previously lived there was a dope head and that, you know, he was a gambler-holic [sic], and she said was I like that. And I told her I wasn't.  I said, "I don't do drugs and I don't gamble."

Additionally, Mr. Turner stated that he understood that when Petitioner Adams called Price Gregory to complain about Mr. Taylor's late parking fee, Petitioner Adams also complained about Mr. Turner, despite the fact that he did not owe any outstanding fees to the hotel.  After finding out about this telephone call, Mr. Turner stated that "[w]hen I got off work I immediately went home to the hotel and spoke with [Petitioner Adams] about the accusations, you know, what she said."  In response to his inquiry, Mr. Turner stated that Petitioner Adams said "'[y]ou guys are obnoxious' - you guys – 'you people, you're obnoxious,' you know, 'I want you all out of here.' And that was the conversation.  She just walked away from me."  When asked if Petitioner Adams's telephone call to his employer caused him concern, Mr. Turner testified:

7

Yes, it did.  I mean because I work hard – we work hard to be in the position we're in.  You know, it took years for us to get to this position, you know, on our job, you know, and then for someone to call your job to destroy your livelihood, which is me taking care of my family, my kids, that hurts, that hurts me.  I was embarrassed, you know, I was ashamed, you know.

Finally, Mr. Turner was asked why he chose to pursue this lawsuit.  He stated:

Well, to be perfectly honest, we wanted our day in court, you know.  I mean the way I feel, I feel as if I was mistreated.  I feel like she judged me without actually getting to know me.  She don't know nothing about me. All she knows is my appearance.  And I work hard for a living.  I'm a citizen of the United States of America, so therefore I should be treated as a citizen.

Petitioner Adams testified during Respondents' case-in-chief.  She stated that she was the sales manager at the McClure Hotel in October 2011.  When asked if the McClure Hotel had a "waiting list" for long-term apartment rooms, Petitioner Adams stated:

A.      Technically speaking, it wasn't necessarily a waiting list per se, but, yes, I did prioritize those who were actually in the hotel to go first in priority for the apartment side.  I had very limited amount of apartments over there to work with.  But those who are in-house were priority.

Q.      My question was limited, Ms. Adams, to –

A.      But no, there was not technically a rooming list that I took names and priorities, but no.

Q.      Okay.  So your testimony to this jury is there was not an official waiting list?

8

A. Technically speaking, no.

Petitioner Adams denied that she told Mr. Tuner that he was first on the "waiting list." However, during subsequent testimony, Petitioner Adams had the following exchange with Respondents' counsel:

Q. Did you tell Mr. Turner there was any type of waiting list?

A. I told him that there was a wait.

Q. So you told him there was a wait?

A. That I didn't have anything available for him at the time, but I would certainly put him at the top of my list. Maybe that's where he got a little confused. But, no, there was not a list, and I did not say you're number one to go into a room. I would not do that, sir, I would not do that because I knew the dynamics of everything. Seriously, no, sir.

Petitioner Adams confirmed that Mr. Taylor called the McClure Hotel prior to his arrival and that she spoke with him on the telephone. However, she did not recall "specifically saying yes, I have an apartment available." When asked whether she had any documentation showing that all of the long-term apartment rooms were occupied in October 2011, Petitioner Adams stated, "I don't have anything with me right now at the moment, but I'm sure there could be – they were in extremely high demand, and the availability for those apartments were very far and very few on the in between."[4]

---

[4] During discovery, Respondents requested the following documents from Petitioners: "Please provide copies of any 'waiting lists,' 'sign-in-sheets,' or other documents evidencing the order in which apartments were let to applicants that were

9

Next, Petitioner Adams denied that the reason Mr. Taylor and Mr. Turner were eventually given long-term apartment rooms was because they complained to the hotel's general manager, Cindy Johnson. However, Petitioner Adams confirmed that Cindy Johnson "had mentioned that they [Mr. Taylor and Mr. Turner] had – yes, they had come to her, yes." Counsel then asked, "was it not soon thereafter the gentlemen complained to Miss [Cindy] Johnson that they got the two [long-term apartment] rooms?" Petitioner Adams replied, "[y]es."

Petitioner Adams confirmed that she called Price Gregory's office manager when Mr. Taylor had an outstanding fee. She stated that this was the first time she had ever called a hotel occupant's employer about a late payment. Respondents' counsel then asked about a white Price Gregory employee whose rent was also late: "Well, Mr. Gusik, the white gentleman friend of yours, he was late sometimes for rent, wasn't he?" Petitioner Adams replied, "[m]aybe a day or so, yes, maybe a day or so." However, Petitioner Adams testified that she did not call Price Gregory regarding Mr. Gusik.

While Petitioner Adams generally denied disparaging Mr. Taylor during her call to Price Gregory, she was asked whether she told Price Gregory that Mr. Taylor had financial problems. She replied:

> No. Listen, I did mention that evidently he has something –
> there's something going on that he's late. I did not say he has
> a gambling problem, he has a drug problem. I did let her [Price

utilized at any time from January 1, 2010 until the present day." Petitioners' response to this request was "defendants have no materials responsive to this request."

10

Gregory's office manager] know that he was late; I wasn't sure what the issue was, but it was what it was. That's it.

Q. My question, ma'am, was did you tell [Price Gregory's office manager] specifically that he had financial problems?

A. Yes, I could – yes, yes, evidently, yes.

Finally, Respondents' counsel asked Petitioner Adams if she made disparaging remarks about Mr. Taylor and Mr. Turner to an attorney, Jay McCamic ("Attorney McCamic"), who was previously involved in the case. She replied, "[n]o."

During Petitioners' case-in-chief, Petitioner Adams was again called to testify. She denied referring to Mr. Taylor or Mr. Turner as a "drug addict," "deadbeat," or "gambler." Further, Petitioner Adams denied that white guests were given long-term apartment rooms ahead of Mr. Taylor or Mr. Turner. During cross-examination, she denied making any disparaging remarks about either Respondent generally, and she specifically denied making any disparaging comments about either Respondent to Attorney McCamic:

Q. Okay. And you were also asked to deny all those things about never said deadbeat, never said gambler, you never accused these people of being gamblers or blowing their checks on gambling or anything to anyone, did you?

A. No.

Q. Not even [to] Mr. McCamic, correct, ma'am?

A. No, no.

Following this testimony, Petitioners rested. Respondents called a rebuttal witness—Attorney McCamic. Petitioners' counsel objected to Attorney McCamic being called as a rebuttal witness and had the following exchange with the trial judge:

11

Petitioners' Counsel: I will place on the record an objection to calling [Attorney McCamic] as a witness. It's not rebuttal testimony. They could have put him on in their case-in-chief to talk about if she [Petitioner Adams] allegedly said that she called them – I assume he's going to bring him in to say that he spoke to her and she called them these names. I mean that's their case-in-chief.

Trial judge: Well, no, not until and unless she affirmatively either admits to saying things or denies it, and she has denied it, so it's in direct rebuttal to that, I assume.

. . . .

Let me just say briefly on the issue of this rebuttal witness, [Respondents' counsel] called her [Petitioner Adams] in his case[-in-chief,] and he asked her that question specifically, did you tell [Attorney] McCamic X, Y and Z, and she denied it. He had every opportunity in his case-in-chief at that point to rebut that testimony. He chose not to. He closed his case-in-chief. You [Petitioners' counsel] called her, she did it again. This is in direct rebuttal to that. Had she not testified in your case-in-chief there would be nothing else to rebut and he would not have been able to call [Attorney] McCamic. So that's really why it's coming up at this point.

Attorney McCamic testified that he was approached by Respondents about representing them in their lawsuit, and agreed to do so.[5] He discovered that Respondents had already filed a complaint, pro se, and he explained that "I think I entered a voluntary dismissal [of the initial lawsuit], because I don't think an answer had happened yet." Attorney McCamic testified that he called Petitioner Adams to notify her that he would be representing the Respondents, and to notify her that the initial lawsuit would be dismissed

---

[5] Attorney McCamic was not Respondents' trial counsel. He testified that while his law firm was representing the Respondents, "I haven't had anything to do with the case for a long time[.]"

12

and refiled by him. After hearing that Respondents' initial lawsuit would be dismissed, Attorney McCamic stated that Petitioner Adams "started talking about all this stuff about them, kind of how terrible they were and all this, kind of like I was an ally, like, okay, great, this is dismissed, it should have been, they're terrible people, you know, whatever." He testified that he corrected Petitioner Adams by stating that he was preparing a new lawsuit to file, and Petitioner Adams became "even more talkative" and said "that they were terrible people and they were scam artists and all sorts of kind of scandalous stuff." Further, Attorney McCamic recalled that "[t]he casino . . . was mentioned and gambling and the loss of money, meaning that they didn't have any money, and they were basically untrustworthy people that you couldn't count on to pay the rent[.]"

The case was submitted to the jury, and it found Petitioners liable under the WVHRA. The jury awarded each Respondent $475,000.00. Thereafter, Petitioners moved for judgment as a matter of law or, alternatively, for a new trial under Rules 50(b) and 59(a), respectively, of the West Virginia Rules of Civil Procedure.[6] After the circuit court entered its October 25, 2018, order denying this motion, Petitioners filed the instant appeal.

---

[6] Rule 50(b) provides, in part:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew the request for judgment as a matter of law by filing a motion no later than 10 days after

13

## II. STANDARD OF REVIEW

We will set out the standard of review for each issue as it is addressed below. *See State v. Boyd*, 238 W. Va. 420, 428, 796 S.E.2d 207, 215 (2017) ("We will dispense with our usual standard of review section because each of the assignments of error has its own review criteria."); *State v. Dunn*, 237 W. Va. 155, 158, 786 S.E.2d 174, 177 (2016) ("Therefore, we dispense with setting out a general standard of review. Specific standards of review will be discussed separately as we address each assignment of error.").

## III. ANALYSIS

On appeal, Petitioners argue that: 1) Respondents "failed to present evidence that the Petitioners violated the [WVHRA] and denied the Respondents accommodations of the hotel in any way;" 2) the circuit court erred by allowing Attorney McCamic to testify; and 3) the jury's verdict was excessive.

---

entry of judgment and may alternatively request a new trial or join a motion for a new trial under Rule 59.

Petitioners moved for judgment as a matter of law at the close of Respondents' case-in-chief and, again, at the close of evidence. Rule 59(a), provides, in part: "[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law[.]"

14

## A. WVHRA

We first consider whether the circuit court erred by denying Petitioners' renewed motion for judgment as a matter of law after trial pursuant to Rule 50(b). Petitioners' motion was based on their claim that Respondents failed to present evidence during the trial that Petitioners withheld, denied or refused any accommodations, advantages, privileges or services of the hotel.

Our standard of review is *de novo*. "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). Further, we have held:

> When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the West Virginia Rules of Civil Procedure [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. Pt. 2, *Fredeking v. Tyler*. With this standard in mind, we turn to Petitioners' argument.

Our first step is to examine the WVHRA. It is to be "liberally construed to accomplish its objectives and purposes[.]" W. Va. Code § 5-11-15 (1967). One objective of the WVHRA is to "eliminate all discrimination in . . . places of public accommodations by virtue of race." W. Va. Code § 5-11-4 (2001). The specific provision of the WVHRA

15

at issue is W. Va. Code § 5-11-9(6)(A) (2016).[7] It provides that "[i]t shall be an unlawful discriminatory practice, . . .

> (6) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodations to:
>
> (A) Refuse, withhold from or deny to any individual because of his or her race, religion, color, national origin, ancestry, sex, age, blindness or disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public accommodations[.]

This Court has set forth the elements a plaintiff must satisfy to establish a prima facie case of discrimination in a place of public accommodation:

> In order to make a prima facie case of discrimination in a place of public accommodation, the complainant must prove the following elements:
> (a) that the complainant is a member of a protected class;
> (b) that the complainant attempted to avail himself of the "accommodations, advantages, privileges or services" of a place of public accommodation; and
> (c) that the "accommodations, advantages, privileges or services" were withheld, denied or refused to the complainant.

---

[7] When examining this statute, we are mindful of our rules of statutory interpretation. This Court has held that in deciding the meaning of a statutory provision, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995); *see also* Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); and Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

Syl. Pt. 1, *K-Mart Corp. v. Human Rights Comm'n*, 181 W. Va. 473, 383 S.E.2d 277 (1989).

In the instant case, there is no dispute that Respondents satisfy the first two elements of this test. Petitioners' argument is based on its contention that Respondents did not establish that the accommodations, advantages, privileges or services of the McClure Hotel were withheld, denied or refused. Petitioners assert that they provided Respondents with "sleeper rooms" upon arrival, and long-term apartment rooms once they became available. Further, Petitioners state that Respondents needed to have demonstrated something "actually refused, withheld, or denied."

Moreover, Petitioners note that Respondents' closing argument highlighted Petitioner Adams's rude behavior. According to Petitioners, rude behavior is insufficient to prove a prima facie case of discrimination under the WVHRA. Petitioners cite this Court's ruling in *K-Mart Corp. v. W. Va. Human Rights Comm'n*, in which we stated "[s]tanding alone, . . . rudeness is [in]sufficient to prove a prima facie case of discrimination." 181 W. Va. at 478, 383 S.E.2d at 282.

Upon review, we find no error with the circuit court's ruling denying Petitioners' Rule 50(b) motion for judgment as a matter of law on Respondents' WVHRA discrimination claim. Viewing the evidence adduced at trial in a light most favorable to Respondents, we find that they offered considerable evidence of the denial, refusal, and withholding of the long-term apartment rooms through the following: 1) Mr. Taylor's testimony that he called the hotel, asked about long-term apartment rooms and was told

17

these rooms were available; 2) upon appearing in person at the hotel, Mr. Taylor was told that the long-term apartment rooms were not available and that he would be placed on a "waiting list;" 3) the hotel did not have a "waiting list;"[8] 4) Mr. Taylor and Mr. Turner testified that they both observed white coworkers, later-hired, and later-arriving, being provided with long-term apartment rooms ahead of them;[9] 5) after observing these coworkers being provided with long-term apartment rooms ahead of them, Mr. Taylor and Mr. Turner testified that they asked Petitioner Adams why this occurred, and she again referred them to the non-existent "waiting list;" 6) Mr. Taylor and Mr. Turner brought their complaint to the hotel's general manager who told them that the hotel did not have a "waiting list," and referred them back to Petitioner Adams; and 7) Mr. Taylor and Mr. Turner testified that they were provided with long-term apartment rooms shortly after

---

[8] When asked if the hotel had a "waiting list," Petitioner Adams testified "[t]echnically speaking, no." Further, Mr. Taylor testified that after he complained to the hotel's general manager, she told him that the hotel did not have a "waiting list."

[9] We note that Petitioners had the opportunity to cross-examine Mr. Taylor and Mr. Turner about their inability to state the full names of the later-hired, later-arriving white coworkers who were provided with long-term apartment rooms ahead of them. Further, counsel for Petitioners emphasized the fact that Respondents did not know the full names of these white coworkers during his closing argument, stating, "I mean that weighs on their credibility as witnesses. That's their main argument as to the denial of accommodations, was that these white coworkers received rooms before them, but I can't name one, . . . I just saw them, I know it happened. . . . That's not credible." The jury had the opportunity to consider this issue along with the totality of the evidence presented and determine whether Respondents established their WVHRA discrimination claim.

complaining to the hotel's general manager.[10]  Based on the foregoing, it is clear that Respondents presented ample evidence from which the jury could have concluded that they were denied long-term apartment rooms for a period of their stay on the basis of their race.

Further, we disagree with Petitioners' contention that Respondents failed to establish a prima facie claim under the WVHRA because they were provided with "sleeper rooms" upon arrival, and eventually provided with long-term apartment rooms.  Petitioners argue that because there was not a total withholding of accommodations, Respondents did not establish a prima facie claim.  This narrow, restrictive interpretation of the WVHRA is not supported by the statute's plain language, purpose, or caselaw from this Court.

The statutory provision at issue, W. Va. Code § 5-11-9(6)(A), is written broadly, and provides that it is an unlawful discriminatory practice to "[r]efuse, withhold from or deny to any individual because of his or her race, . . . *either directly or indirectly, any* of the accommodations, advantages, facilities, privileges or services of the place of public accommodations[.]" *Id.* (Emphasis added).  This statutory language does not restrict unlawful discriminatory practices to only those situations in which there has been a complete withholding of accommodations.  Further, one purpose of the WVHRA is to "eliminate *all discrimination* in . . . places of public accommodations by virtue of race." W. Va. Code § 5-11-4 (2001). (Emphasis added).  Finally, in *Charleston Acad. of Beauty*

---

[10] Petitioner Adams confirmed that Respondents were provided with long-term apartment rooms shortly after they complained to the hotel's general manager.

19

*Culture, Inc. v. W. Va. Human Rights Comm'n*, No. 11-1286, 2012 WL 3129142, *14 (W. Va. May 25, 2012)(memorandum decision), this Court found no error in the circuit court's rejection of the "contention that there is no violation of the [WVHRA] unless there is a complete withholding of privileges or services."

We also disagree with Petitioners' argument that this Court's ruling in *K-Mart v. W. Va. Human Rights Comm'n* supports their position that Respondents failed to establish a prima facie discrimination claim. In *K-Mart*, the Court found that "rudeness" alone is insufficient to prove a prima facie case of discrimination. 181 W. Va. at 478, 383 S.E.2d at 282. Because the appellants in *K-Mart* "shopped without hindrance," they were unable to show that they "were actually denied, refused, or withheld any services or amenities." *Id.* The instant matter is distinguishable from *K-Mart* because Respondents offered evidence of the denial, refusal, and withholding of long-term apartment rooms through the testimony discussed above. The jury also heard testimony that Petitioner Adams did not call Price Gregory to complain about a white coworker who was similarly situated to Mr. Taylor regarding the late payment of rent, and that Petitioner Adams made numerous disparaging comments to Respondents. These disparaging comments, while not sufficient standing alone to establish a prima case of discrimination, are relevant to our analysis. In *K-Mart*, the Court provided:

> Standing alone, we do not believe rudeness is sufficient to prove a prima facie case of discrimination. While we do not mean to dismiss the effect of intimidation as an element in discrimination, it is, at best, too objective and difficult to quantify alone. Rather, intimidation should simply be treated

20

as a factor in our test to determine whether the complainant has made a prima facie case of discrimination.

181 W. Va. at 478-79, 383 S.E.2d at 282-83.

Thus, Petitioner Adams's disparaging comments to Respondents, which Petitioners characterize as mere "rudeness," is a factor that may be considered when examining whether Respondents established a prima facie case of discrimination. Considering these comments, along with the other evidence presented by Respondents, we reject Petitioners' argument that our ruling in *K-Mart* supports their position that Respondents failed to establish a prima facie discrimination claim.

Based on all of the foregoing, we reject Petitioners' first assignment of error.

## B. Rebuttal Witness

Petitioners' second assignment of error is that the circuit court erred by allowing Attorney McCamic to testify as a rebuttal witness. Petitioners moved for a new trial based on this alleged error pursuant to Rule 59 of the West Virginia Rules of Civil Procedure. This Court employs an abuse of discretion standard of review when considering a circuit court's ruling on a motion for a new trial. In *Tennant v. Marion Health Care Found.*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995), the Court provided:

> Thus, in reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

21

Petitioners argue that when they called Petitioner Adams to testify during their case-in-chief, they did not ask her about her conversation with Attorney McCamic. Instead, during cross-examination, Respondents' counsel asked Petitioner Adams about her conversation with Attorney McCamic. Therefore, Petitioners assert that the circuit court erred by concluding that Petitioners opened the door to Attorney McCamic being called as a rebuttal witness.

After review, we find no abuse of discretion with the circuit court's ruling permitting Attorney McCamic to testify. It is well-established that "[w]hether a plaintiff will be allowed to introduce further evidence after the evidence in behalf of a defendant is concluded is ordinarily within the discretion of the trial court, and the exercise of such discretion will rarely constitute ground for reversal." Syl. Pt. 10, *Edmiston v. Wilson*, 146 W. Va. 511, 120 S.E.2d 491 (1961). Likewise,

> [u]nder Rule 611(a) of the West Virginia Rules of Evidence, a trial court has broad discretion in permitting or excluding the admission of rebuttal testimony, and this Court will not disturb the ruling of a trial court on the admissibility of rebuttal evidence unless there has been an abuse of discretion.

Syl. Pt. 2, *Belcher v. Charleston Area Med. Ctr.*, 188 W. Va. 105, 422 S.E.2d 827 (1992).[11]

---

[11] Rule 611(a) of the West Virginia Rules of Evidence provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." *See also* Syl. Pt. 2, *Perdue v. Caswell Creek Coal & Coke Co.*, 40 W. Va. 372, 21 S.E. 870 (1895) ("Whether plaintiff shall be allowed to give further evidence after defendant's evidence is closed is within the discretion of the trial court; and its exercise

22

In the instant case, Petitioner Adams denied making derogatory statements about Respondents, including to Attorney McCamic, during Respondents' case-in-chief. When called to testify during Petitioners' case-in-chief, Petitioner Adams again denied making derogatory comments about Respondents. Counsel for Petitioners asked her specifically whether she had called either Mr. Taylor or Mr. Turner "a druggie or a drug addict," "a deadbeat," or a "gambler." She replied "no" to each of these questions. When counsel for Respondents cross-examined Petitioner Adams, she again denied making any of these remarks, and specifically denied making such derogatory remarks to Attorney McCamic. Based on this testimony, we find that the circuit court did not abuse its discretion by permitting Respondents to call Attorney McCamic as a rebuttal witness. "[T]he most significant limitation on the court's authority under Rule 611(a) is that the action of the court must be reasonable." *Wheeler v. Murphy*, 192 W. Va. 325, 333, 452 S.E.2d 416, 424 (1994) (citation omitted). Because Petitioner Adams denied making disparaging comments about Respondents when testifying during Petitioners' case-in-chief, it was reasonable for the circuit court to permit Attorney McCamic to testify in rebuttal that Petitioner Adams had made such statements. Therefore, we find no abuse of discretion with the circuit court's ruling on this issue.[12]

---

will rarely, if ever, be the ground of reversal by an appellate court. Clearly, he is entitled to give evidence to rebut that of the defendant.").

[12] On appeal, Petitioners asserted a number of errors regarding the circuit court's ruling permitting Attorney McCamic to testify. These errors include that his testimony

## C. Jury Verdict

The final assignment of error is that the circuit court erred by denying Petitioners' motion for a new trial on the basis that the jury verdict was excessive. As with the prior assignment of error, we employ an abuse of discretion standard of review when reviewing a circuit court's ruling on a motion for a new trial. *Tennant v. Marion Health Care Found.*, 194 W. Va. at 104, 459 S.E.2d at 381.

Similar to their argument that Respondents failed to establish a prima facie discrimination claim under the WVHRA, Petitioners argue that Respondents were not denied accommodations at the McClure Hotel—they were provided with "sleeper rooms" upon their arrival, and long-term apartments rooms once available. Additionally, Petitioners state that: 1) "[t]here was no evidence adduced that either [Respondent was] treated any differently than any white guest or their white co-workers;" 2) Respondents submitted no evidence of out-of-pocket losses or other quantifiable damages; and 3) the

---

was irrelevant or, if relevant, unfairly prejudicial; that it violated the Rules of Professional Conduct; and that it was improper testimony from a party's lawyer. During the trial, Petitioners only objected to Attorney McCamic's testimony on the ground that it was improper rebuttal. The circuit court addressed and denied this specific objection. The circuit court did not, and could not, address these additional objections that were not raised. "An objection to a circuit court ruling that admits evidence must be timely made and must state the specific ground of the objection, if the specific ground is not apparent from the context." Syl. Pt. 3, *Perrine v. E.I. du Pont de Nemours and Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010). Because Petitioners did not object to Attorney McCamic's testimony on the additional grounds it argues before this Court, we decline to consider these arguments. *See Coleman v. Sopher*, 201 W. Va. 588, 601, 499 S.E.2d 592, 605 (1997) ("Timely and specific objections are required under Rule 103(a) of the West Virginia Rules of Evidence, and Rule 46 of the West Virginia Rules of Civil Procedure.").

jury's verdict was influenced by passion and/or a mistaken view of the case because it based its verdict "on its own distaste for how [Petitioner] Adams treated, interacted with, or allegedly thought about" Respondents.

After review, we find no abuse of discretion with the circuit court's ruling rejecting Petitioners' argument that the verdict was excessive. We have held that "[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl. Pt. 1, *Addair v. Majestic Petroleum Co., Inc.,* 160 W. Va. 105, 232 S.E.2d 821 (1977). In cases where

> the compensation which the plaintiff is entitled to recover is indeterminate in character, the verdict of the jury may not be set aside as excessive unless it is not supported by evidence or is so large that the amount thereof indicates that the jury was influenced by passion, partiality, prejudice or corruption, or entertained a mistaken view of the case.

Syl. Pt. 7, in part, *Poe v. Pittman*, 150 W. Va. 179, 144 S.E.2d 671 (1965) (citation omitted). "[A] mere difference of opinion between the court and the trial jury concerning the proper amount of recovery will not justify either the trial court or this Court in setting aside the verdict on the ground of inadequacy or excessiveness." *Sargent v. Malcomb*, 150 W. Va. 393, 396, 146 S.E.2d 561, 564 (1966) (citation omitted).

Petitioners' argument that the jury verdict was excessive downplays and minimizes the evidence of racial discrimination adduced at trial. The jury heard evidence that Respondents were denied the long-term apartment rooms through the guise of a non-existent "waiting list;" that similarly situated white coworkers were given long-term

25

apartment rooms immediately; that Petitioner Adams did not call Price Gregory to complain about a white coworker who was similarly situated to Mr. Taylor regarding the late payment of rent; and testimony from both Mr. Taylor and Mr. Turner about the distress that this treatment caused them. Further, we find no support for Petitioners' speculative assertion that the jury must have entertained a mistaken view of the case. Petitioners have failed to establish that the jury's verdict was based "on its own distaste for how [Petitioner] Adams treated, interacted with, or allegedly thought about" Respondents.

Additionally, the circuit court properly instructed the jury on the damages it could award, including damages for "emotional distress, upset, humiliation, and embarrassment, and impairment to reputation." As noted in the circuit court's order denying Petitioners' motion for judgment as a matter of law, or, alternatively, a new trial, "[w]hen it came to assessing the damages in this case, the jury was appropriately instructed, *without objection by the [Petitioners]* as to the specific language used[.]" (Emphasis added).

In sum, we agree with the circuit court's determination that it had "no reason to believe that the jury did anything other than listen to the evidence and calculate an award, based upon the instructions given to them, [that] they felt was just, fair, and appropriate." Based on the foregoing, we find the circuit court did not abuse its discretion in denying Petitioners' motion for a new trial based on the excessiveness of the verdict.

## IV. CONCLUSION

We affirm the circuit court's October 25, 2018, order denying Petitioners' motion for judgment as a matter of law, or, alternatively, a new trial.

Affirmed.